UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



ALEXANDER GUERRERO TORO,

    Plaintiff,

     v.

NORTHSTAR DEMOLITION &
REMEDIATION,

    Defendant.

**DECISION AND ORDER**

6:16-CV-06610 EAW

## INTRODUCTION

Plaintiff Alexander Guerrero Toro ("Plaintiff"), proceeding *pro se*, commenced this action on September 6, 2016, alleging that NorthStar Demolition & Remediation LP[1] ("Defendant") violated his rights under the Americans with Disabilities Act of 1990, as codified, 42 U.S.C. § 12112 *et seq.* (the "ADA"), by failing to provide reasonable accommodations for his alleged disability, wrongfully terminating his position of employment, permitting workplace harassment, and retaliating against him on the basis of his disability. (Dkt. 1). Presently before the Court is Defendant's motion for summary judgment. (Dkt. 42). For the following reasons, Defendant's motion is granted.

---

[1] Defendant notes that its name is spelled incorrectly in the caption of this action. (Dkt. 48 at 9).

# BACKGROUND[2]

## I.    Plaintiff's Employment as an Asbestos Handler

Plaintiff began his employment with Defendant as an asbestos handler in February 2015. (Dkt. 42-1 at ¶ 21; *see* Dkt. 43-1 at 44-45, 50).[3] An asbestos handler removes asbestos and performs limited interior demolition, worksite cleaning, "work area plasticizing," water filtration procedures, and "hot work" on abatement projects. (Dkt. 42-1 at ¶ 22; *see* Dkt. 43-1 at 52-53, 60-63). These responsibilities generally require the use of both hands. (Dkt. 42-1 at ¶ 23; *see, e.g.*, Dkt. 43-1 at 55-57, 59, 61-62). For example, work area plasticization requires both hands to hang plastic sheets securing the area, and an asbestos handler's demolition duties entail the operation of power drills and the use of sledgehammers. (Dkt. 42-1 at ¶¶ 26-28; *see* Dkt. 43-1 at 56-57, 63).

Plaintiff was primarily charged with using a "power-washer" machine, which is a device that "sprays high pressure water from a hose" and requires both hands to operate. (Dkt. 42-1 at ¶¶ 29-30, 33, 43; *see* Dkt. 43-1 at 64-65; Dkt. 44 at ¶ 22). One hand must continuously grip the trigger on the machine's "wand" to release the flow of water, while

---

[2]    The Court notes that while Plaintiff has filed various documents in opposition to Defendant's motion (Dkt. 56; Dkt. 57), he has failed to submit any sworn affidavits or other evidence in admissible form. Plaintiff has also failed to file a responding Rule 56 statement of undisputed facts. Accordingly, the following facts are drawn from Defendant's unopposed Rule 56 statement (Dkt. 42-1) to the extent Defendant's assertions therein are supported by evidence in the record, *see Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (stating that "the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement," but instead "must be satisfied that the citation to evidence in the record supports the assertion").

[3]    Although Plaintiff "understands a little bit" of English (Dkt. 43-1 at 37), he primarily speaks Spanish (Dkt. 50-1 at 6).

the other hand maneuvers the wand to direct the water at the desired target. (Dkt. 42-1 at ¶¶ 31-32; *see* Dkt. 43-1 at 64-65; Dkt. 44 at ¶ 22). Plaintiff's other duties included the removal of asbestos, lead, mercury, batteries, certain light fixtures, and different types of chemicals. (Dkt. 42-1 at ¶ 35; *see* Dkt. 43-1 at 53-56). When removing mercury, Plaintiff was at times required to scale ladders and scaffolding and use both his hands to unscrew lamps, cut cables, and apply sealant. (Dkt. 42-1 at ¶ 36; *see* Dkt. 43-1 at 53-56). Plaintiff used the power-washer to spray pressurized water at the worksite asbestos, and then placed the asbestos into disposal bags. (Dkt. 42-1 at ¶ 38; *see* Dkt. 43-1 at 57-59). Asbestos handlers also changed the hoses and filters on the water treatment system that filtered water at the worksite, which required the use of both hands as well. (Dkt. 42-1 at ¶ 39; *see* Dkt. 43-1 at 60-61).

Additionally, asbestos handlers were assigned "hot work," which entails using a "flaming gas pressurized tool to cut though" train rails and requires the operator to use both hands in doing so. (Dkt. 42-1 at ¶ 41; *see* Dkt. 43-1 at 61-62; Dkt. 45 at ¶ 33). After hot work is completed, another employee is required to watch the gas tool for about one hour to make sure it does not reignite, but this secondary task, denoted as "fire watching," is "only required when someone performed hot work" to begin with. (Dkt. 42-1 at ¶ 42; *see* Dkt. 44 at ¶ 31; Dkt. 45 at ¶ 33; *see also* Dkt. 43-1 at 88).

## II.    The Onset of Plaintiff's Disability

Between February 2015 and August 2015, Plaintiff had full use of each of his arms and hands and could perform all the essential functions of an asbestos handler. (Dkt. 42-1 at ¶ 44; *see* Dkt. 43-1 at 66). Starting in August 2015, Plaintiff began to experience pain

in his right arm, which he attributed to his use of the power-washer. (Dkt. 42-1 at ¶¶ 45-46; *see* Dkt. 45 at ¶ 20). Plaintiff subsequently opened a Workers' Compensation claim and was examined by a medical physician before being placed on "restricted duty." (Dkt. 42-1 at ¶¶ 46-48; *see* Dkt. 45 at ¶ 21; Dkt. 45-1 at 6). At this point, Plaintiff was directed not to use his right arm or right hand. (Dkt. 42-1 at ¶¶ 46-48; *see* Dkt. 45-1 at 6).

As a result of Plaintiff's limited use of his extremities, he was unable to perform certain essential functions of an asbestos handler. (Dkt. 42-1 at ¶ 49; *see* Dkt. 43-1 at 45-49, 97-99; Dkt. 44 at ¶ 14; Dkt. 45 at ¶ 57). Initially, Defendant offered Plaintiff "light duty tasks" to permit his continued employment despite these physical limitations. (Dkt. 42-1 at ¶ 50; *see* Dkt. 44 at ¶¶ 26-28; Dkt. 45 ¶¶ 25, 30). Because Defendant's employees had difficulty finding applicable light duty tasks to assign Plaintiff, Plaintiff was permitted to watch safety trainings and clean an on-site office trailer, which were not tasks assigned to asbestos handlers. (Dkt. 42-1 at ¶ 51; *see* Dkt. 44 at ¶ 26; Dkt. 45 at ¶ 25).

On August 31, 2015, a physician examined Plaintiff for a second time. (Dkt. 42-1 at ¶ 52; *see* Dkt. 45 at ¶ 24). The physician concluded that Plaintiff's restrictions had not changed, and Plaintiff was advised to refrain from using his right hand and right arm; limitations that continued to undermine his ability to perform all essential functions of an asbestos handler. (Dkt. 42-1 at ¶¶ 52-53; *see* Dkt. 43-1 at 45-49, 97-99; Dkt. 45 at ¶ 24; Dkt. 45-1 at 9). On September 18, 2015, Plaintiff supplied a doctor's note from the New York Physical Medicine Center, LLC, which dictated that Plaintiff restrict the use of his upper right extremities for eight weeks. (Dkt. 42-1 at ¶ 57; Dkt. 45 at ¶ 27; Dkt. 45-1 at 12). On September 22, 2015, Plaintiff was diagnosed with mild carpal tunnel syndrome in

his left side and moderate carpal tunnel syndrome in his right side. (Dkt. 42-1 at ¶ 124; *see* Dkt. 43-1 at 152). Plaintiff subsequently received another doctor's note from the same facility, dated September 23, 2015, which directed Plaintiff to limit any "gripping, grasping or lifting [of] more than 10 pounds with his right hand." (Dkt. 42-1 at ¶ 57; Dkt. 45 at ¶ 28; Dkt. 45-1 at 14). On October 9, 2015, Plaintiff submitted a third doctor's note, indicating that Plaintiff should avoid "repetitive gripping and grasping" and "lifting more than 15 pounds" with his upper right extremities for ten weeks. (Dkt. 42-1 at ¶ 59; Dkt. 45 at ¶ 29; Dkt. 45-1 at 16). On November 20, 2015, Plaintiff secured a fourth doctor's note, indicating that Plaintiff should "avoid writing paperwork, avoid repetitive gripping and grasping," and avoid lifting "more than 10 pounds" with his upper right extremities for about 12 weeks. (Dkt. 42-1 at ¶ 61; *see* Dkt. 43-1 at 123).

## III.  Plaintiff's New Job Assignments

In light of Plaintiff's restrictions, Defendant created "new light duty assignments for Plaintiff" between September and October of 2015 to keep him employed, which included the decontamination of tools utilized at the worksite. (Dkt. 42-1 at ¶¶ 63-64; *see* Dkt. 43-1 at 68-69; Dkt. 44 at ¶¶ 26-28). When Plaintiff "complained" that this task "required him to use his right hand," Defendant assigned other light duty tasks to Plaintiff, which included "sweeping and picking up garbage, picking up loose nails with a magnetic broom, fire watching, tracking the entry and exit time of vehicles and their license plates as they exited and entered the [worksite], inspecting and measuring fences and monitoring the water treatment system for leaks." (Dkt. 42-1 at ¶ 65; *see* Dkt. 43-1 at 71, 84, 86, 88-90; Dkt. 44 at ¶ 28; Dkt. 45 at ¶ 30).

Asbestos handlers were not generally responsible for performing such tasks, with the exception of fire watching. (Dkt. 42-1 at ¶¶ 64, 66-67; *see* Dkt. 44 at ¶ 28; Dkt. 45 at ¶ 30). Asbestos handlers performed fire watching duties after "hot work" on a "boiler casing" because "disposing of the boiler was part of the asbestos removal process," but this task was conducted about 200 feet above the worksite and required the worker to climb ladders and scaffolding. (Dkt. 42-1 at ¶¶ 67-68; *see* Dkt. 44 at ¶¶ 31-32; Dkt. 45 at ¶ 33). Since Plaintiff was unable to safely scale ladders and scaffolding to reach these elevated positions, Plaintiff was assigned to "fire watch" after hot work was performed on train rails on the ground; an assignment not usually tasked to asbestos handlers because it is not related to asbestos abatement. (Dkt. 42-1 at ¶¶ 68-69; *see* Dkt. 44 at ¶¶ 31-32; Dkt. 45 at ¶ 33).

Subsequently, Plaintiff complained that the task of logging vehicular license plates and the entry and exit times of vehicles coming and going from the worksite was "unsafe" and stated that he would no longer perform this task. (Dkt. 42-1 at ¶ 71; *see* Dkt. 43-1 at 94; Dkt. 44 at ¶¶ 33-34; Dkt. 45 at ¶¶ 34-35). Plaintiff also became "dissatisfied" with the task of inspecting and measuring fences because the measuring tool, which was "similar to a measuring tape connected to a wheel, . . . required him to use his right hand." (*See* Dkt. 42-1 at ¶¶ 72-74; *see* Dkt. 43-1 at 89-91; Dkt. 44 at ¶ 35; Dkt. 45 at ¶ 35). On November 2, 2015, Plaintiff was tasked with monitoring the water treatment system at the worksite for leaks, which was also not a task required of asbestos handlers. (Dkt. 42-1 at ¶¶ 75-76; *see* Dkt. 43-1 at 85, 88-89, 91; Dkt. 44 at ¶ 36; Dkt. 45 at ¶ 37). The water treatment system is located outdoors, and, as the seasonal temperature began to drop, the system would often

freeze, requiring that the hoses, pumps, and filters be disconnected to prevent the system from bursting. (Dkt. 42-1 at ¶¶ 76-77; *see* Dkt. 43-1 at 85, 88-89, 91; Dkt. 45 at ¶ 37).

As a result of his new light duty assignments, Plaintiff's schedule was altered so that he was to report to work at 8:00 A.M., instead of 7:00 A.M., and would sometimes depart early when no more light duty tasks needed to be completed. (Dkt. 42-1 at ¶ 78; *see* Dkt. 43-1 at 87; Dkt. 44 at ¶ 37; Dkt. 45 at ¶ 38). Plaintiff's lunch hour was also altered in order for him to complete his fire watching duties, requiring him to monitor the relevant tools after "hot work" was completed while the other workers had their lunch. (Dkt. 42-1 at ¶ 80; *see* Dkt. 43-1 at 87 Dkt. 44 at ¶ 39; Dkt. 45 at ¶ 40).

## IV.    Plaintiff's Work Absences and Further Medical Complications

Defendant requires its employees to contact their direct supervisors before their shift starts if they plan to be absent. (Dkt. 42-1 at ¶ 81; *see* Dkt. 45 at ¶ 41). Although Plaintiff called his supervisor, Jeffrey Beckingham ("Beckingham") on October 21, 2015, to inform him that he would be absent on October 21st, Plaintiff failed to indicate that he would also be absent on October 22nd and October 23rd as well. (Dkt. 42-1 at ¶¶ 82-84; *see* Dkt. 45 at ¶ 42; *see also* Dkt. 45-1 at 18-20). As a result of Plaintiff's failure to comply with Defendant's employee protocols, he was issued a written warning on October 26, 2015. (Dkt. 42-1 at ¶ 86; *see* Dkt. 45 at ¶ 43). On October 27, 2015, Plaintiff was again absent from work and again failed to notify his supervisor of this absence prior to the start of his shift; although he did call the Site-Safety Officer, Raymond Cox ("Cox"), later that day to inform Cox that he was in the hospital with "high blood pressure." (Dkt. 42-1 at ¶ 88; *see*

Dkt. 45 at ¶ 44). Plaintiff was not disciplined for this action. (Dkt. 42-1 at ¶ 89; *see* Dkt. 45 at ¶ 44).

On October 28, 2015, Plaintiff called "911" while at work logging entry and exit times for vehicles and was transported to Rochester General Hospital. (Dkt. 42-1 at ¶ 91; *see* Dkt. 43-1 at 86; Dkt. 45 at ¶ 46). Plaintiff testified that he called 911 on this occasion because he had been working "under water and it was snowing," and that he lost consciousness when his "pressure went up." (Dkt, 43-1 at 94). When Plaintiff returned to work on November 2, 2015, he had a doctor's note dated October 29, 2015, from Rochester General Hospital, indicating that he could "participate in all duties"—despite the conflicting doctor's note from New York Physical Medicine Center, LLC, dated October 9, 2015, which limited Plaintiff's physical capabilities for ten weeks. (Dkt. 42-1 at ¶¶ 93-94; *see* Dkt. 45 at ¶ 48; Dkt. 45-1 at 26).

At the time, Cox was not aware why Plaintiff had called the ambulance or whether the physician who provided Plaintiff with the November 2, 2015, doctor's note was aware of Plaintiff's physical condition and his work environment. (Dkt. 42-1 at ¶¶ 95-96; *see* Dkt. 45 at ¶ 48). As a result, Defendant suspended Plaintiff from work until Cox could consult with Defendant's Director of Health and Safety, Gary Thibodeaux ("Thibodeaux"), to reconcile the conflicting medical notes. (Dkt. 42-1 at ¶ 97; *see* Dkt. 45 at ¶ 49). During his suspension, Plaintiff confirmed that "the previous restrictions were still in place," and that the "911" call was unrelated to his right-hand limitations. (Dkt. 42-1 at ¶ 98; *see* Dkt. 45 at ¶ 50). After receiving this information, on November 5, 2015, Cox told Plaintiff that he could return to work on November 9, 2015, and Plaintiff did, in fact, report to work that

day to continue his light duty tasks. (Dkt. 42-1 at ¶¶ 99-100; *see* Dkt. 45 at ¶ 50-51; Dkt. 45-1 at 28). However, by December 2015, Cox and Beckingham were experiencing some difficulty in finding light duty tasks to assign Plaintiff, at least in part because the water treatment system had been dissembled to prevent the system from freezing in the cold weather, and the "hot work" performed on the train rails had been completed. (Dkt. 42-1 at ¶¶ 101-03; *see* Dkt. 44 at ¶ 41; Dkt. 45 at ¶ 51; *see also* Dkt 45 at ¶ 33).

## V.     Plaintiff's December 21, 2015 Meeting

On December 14, 2015, Plaintiff walked by a co-worker and told him that he had "the smile of Judas," noting that "Judas was the man who sold Jesus to the Romans for money," and further stated that he had a "surprise" for everyone. (Dkt. 42-1 at ¶ 104; *see* Dkt. 43-1 at 95-96; Dkt. 44 at ¶ 42; Dkt. 45 at ¶ 52). Plaintiff testified that he made these statements to his co-worker because he believed that what the co-worker had "said to the Human Rights Division . . . was a lie and he knows it was a lie." (Dkt. 43-1 at 95-96). Although Plaintiff references a declaration of sorts, the details of exactly what the co-worker previously stated and to what agency he submitted any such statements is not clear from Plaintiff's testimony.

After Plaintiff's comments were reported to Cox and Beckingham, Beckingham met with Plaintiff who admitted to having made the statements to his co-worker. (Dkt. 42-1 at ¶¶ 105-07; *see* Dkt. 43-1 at 95-96; Dkt. 44 at ¶¶ 42-43). On December 21, 2015, Plaintiff participated in a meeting with Beckingham, Philip Piedmont, an Environmental Project Coordinator ("Piedmont"), and Adbiel Pereira ("Pereira"), an asbestos handler who translated the conversations held at the meeting for Plaintiff. (Dkt. 42-1 at ¶ 110; *see* Dkt.

44 at ¶ 45; Dkt. 50-1 at 2-8). Beckingham offered Plaintiff the opportunity to take a medical leave of absence until his physical restrictions were lifted because "no more light duty tasks [were] available for Plaintiff, and after Plaintiff had admitted to making comments" to his co-worker. (*See* Dkt. 42-1 at ¶¶ 109-111; *see* Dkt. 44 at ¶¶ 45-46; Dkt. 50-1 at 3, 7). As of the date of the meeting, Plaintiff was unable to perform several essential functions of an asbestos handler, and Defendant "would have permitted him to return if he was able to perform the essential functions of his job." (Dkt. 42-1 at ¶¶ 114-15; *see* Dkt. 44 at ¶ 49; Dkt. 50-1 at 3, 7; *see also* Dkt. 43-1 at 45-49, 97-99; Dkt. 44 at ¶ 14; Dkt. 45 at ¶ 57).

## **PROCEDURAL HISTORY**

### I. **Plaintiff's NYSDHR Complaints and EEOC Charges**

On October 30, 2015, Plaintiff filed his first administrative complaint with the New York State Division of Human Rights ("NYSDHR") and cross-filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging harassment, disability discrimination, and retaliation pursuant to the New York State Human Rights Law, *see* N.Y. Exec. Law § 296 *et seq.* ("NYSHRL"), and the ADA (Dkt. 42-1 at ¶¶ 147-48, 156; *see* Dkt. 43-2 at 14-48). Plaintiff alleged that he was subject to mockery, unwarranted written warnings, and alterations to his job responsibilities and work schedule. (*See* Dkt. 42-1 at ¶ 148; *see* Dkt. 43-2 at 24-28, 32, 34, 36). Defendant received a copy of Plaintiff's filings on November 5, 2015. (Dkt. 42-1 at ¶ 149; *see* Dkt. 44 at ¶ 51).

Plaintiff filed a second NYSDHR complaint and EEOC charge on November 19, 2015, again alleging discriminatory conduct based upon his carpal tunnel syndrome, which

included the unwarranted placement on administrative suspension, non-payment of overtime hours, and alterations to his work and lunch schedules. (Dkt. 42-1 at ¶¶ 150-51, 156; *see* Dkt. 43-2 at 53-63). Defendant did not become aware of these filings until January 5, 2016. (Dkt. 42-1 at ¶ 152; *see* Dkt. 44 at ¶ 52).

Plaintiff filed his third and final NYSDHR complaint and EEOC charge on December 24, 2015, alleging that he was terminated because of his disability and was retaliated against because he made reports to the NYSDHR and the federal Occupational Safety and Health Administration ("OSHA"). (Dkt. 42-1 at ¶¶ 154, 156; *see* Dkt. 43-2 at 71-77). Defendant became aware of these filings on or about January 5, 2016. (Dkt. 42-1 at ¶ 155; *see* Dkt. 44 at ¶ 53).

## II.   Plaintiff's Federal Litigation

On September 6, 2016, Plaintiff commenced this action proceeding *pro se* (Dkt. 1), and sought leave to proceed *in forma pauperis* (Dkt. 2; Dkt. 5). After Plaintiff was granted *in forma pauperis* status on December 27, 2016 (Dkt. 6), Defendant answered the Complaint on February 28, 2017 (Dkt. 8), and the parties proceeded to discovery (*see* Dkt. 12). After discovery concluded in December 2017 (*see* Dkt. 34), Defendant filed the instant summary judgment motion on January 11, 2018 (Dkt. 42).

In support of its motion, Defendant argues that Plaintiff's claims are procedurally defective and no triable issues of fact exist regarding Plaintiff's allegations of discrimination, harassment, and retaliation, and Defendant is entitled to judgment as a matter of law. (*See* Dkt. 48). Plaintiff opposes Defendant's motion (Dkt. 56; Dkt. 57); however, Plaintiff has failed to file a responsive Rule 56 statement of undisputed material

facts. *See* L.R. Civ. P. 56(a)(2). In addition, Plaintiff has not submitted any sworn affidavits or other evidence in admissible form. *See Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) ("That a party appears pro se, though entitled to some latitude not accorded to litigants represented by counsel, does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003))). Defendant's reply papers emphasize this point and reiterate the arguments submitted in its initial motion papers. (Dkt. 54).

## DISCUSSION

### I.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the

non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II. Assuming Without Deciding that Plaintiff Has Exhausted his Administrative Remedies, Defendant Has Established Its Entitled to Judgment as a Matter of Law on Plaintiff's ADA Claims

Defendant challenges whether Plaintiff exhausted his administrative remedies before asserting his ADA claims in this action. (Dkt. 48 at 12-13). However, "[a]dministrative exhaustion in the . . . ADA context 'is not a jurisdictional [prerequisite], but only a precondition to bringing [suit] . . . that can be waived by the parties or the court.'" *Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 299 (S.D.N.Y. 2016) (quoting *Francis v. City of New York*, 235 F.3d 763, 767 (2d Cir. 2000)). For purposes of this motion, the Court will assume without deciding that Plaintiff has exhausted his administrative remedies

pertaining to each EEOC charge because Defendant has, in any event, established that Plaintiff's ADA claims fail on the merits as a matter of law.

### A. Defendant has Not Violated the ADA

"The ADA prohibits an employer from discriminating against an employee on the basis of a disability." *Price v. City of New York*, 558 F. App'x 119, 120 (2d Cir. 2014) (citing 42 U.S.C. § 12112(a)). "Discrimination may take the form of failing to provide 'reasonable accommodations to . . . an otherwise qualified individual with a disability.'" *Id.* (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)).

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action] . . .; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

> To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."

*Id.* (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)). In order for a plaintiff to put forth a *prima facie* showing of employment discrimination in the context of a failure to accommodate claim, the plaintiff must demonstrate each of the following:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (quotation marks omitted).

Whether a plaintiff's ADA claim is based upon an adverse employment action or his employer's failure to reasonably accommodate his disability, the plaintiff must still be able to perform the essential functions of his position with or without a reasonable accommodation. *See McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) ("In discrimination claims based both on adverse employment actions and on failures to accommodate, the plaintiff 'bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment.'" (quoting *McBride*, 583 F.3d at 97)). Stated differently, "[b]ecause 'a reasonable accommodation can never involve the elimination of an essential job function,' a plaintiff proposing an alternative arrangement (as opposed to a reassignment) still carries the burden of demonstrating that he can perform the essential functions of the original job." *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 202-03 (D. Conn. 2013) (quoting *McMillan*, 711 F.3d at 127).

For purposes of its motion, Defendant does not dispute that Plaintiff is disabled within the meaning of the ADA or that Defendant had notice of Plaintiff's disability. (Dkt. 48 at 14 n.3). Accordingly, Defendant focuses its arguments on the third and fourth elements of Plaintiff's *prima facie* case.

> The Second Circuit has held that to make out a *prima facie* case of employment discrimination based on a failure to provide reasonable accommodation as required by the ADA, the plaintiff must show "either that [he] can perform the essential functions of the job without accommodation or that [he] can do so with reasonable accommodation and that the employer refused to make such an accommodation."

*Caruso v. Camilleri*, No. 04-CV-167A, 2008 WL 170321, at *23 (W.D.N.Y. Jan. 15, 2008) (alterations in original) (quoting *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999)). "In the context of the ADA, reasonable accommodation may include, *inter alia*, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, 'reassignment to a vacant position.'" *McBride*, 583 F.3d at 97 (quoting 42 U.S.C. § 12111(9)(B)). However, "the ADA does not require employers to provide employees with the particular accommodation the employee requests 'so long as the accommodation provided is reasonable.'" *Caruso*, 2008 WL 170321, at *23 (quoting *Fink v. N.Y.C. Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995)). Additionally, "the ADA does not require creating a new position for a disabled employee." *Graves*, 457 F.3d at 187. "An employee who cannot perform the essential functions of his job even with a reasonable accommodation has no claim under the ADA because he is not a qualified individual, and 'it is irrelevant that the lack of qualification is due entirely to a disability.'"

*Murray v. Rick Bokman, Inc.*, No. 99-CV-0015E(SC), 2001 WL 603698, at *6 (W.D.N.Y. May 24, 2001) (quoting *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997)).

"Although the term 'essential functions' is not defined by the ADA, regulations promulgated by the [EEOC] indicate that it encompasses 'the fundamental job duties of the employment position.'" *McBride*, 583 F.3d at 98 (quoting 29 C.F.R. § 1630.2(n)(1)). "Evidence of whether a particular job duty constitutes an essential function includes, *inter alia*, 'the employer's judgment as to what functions of a job are essential' and 'a written description [prepared by the employer] before advertising and interviewing applicants.'" *Id.* (quoting 42 U.S.C. § 12111(8)). "In approaching this inquiry, '[a] court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.'" *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998)).

Plaintiff's claim for disability discrimination rests upon the premise that Defendant sought to terminate him by assigning him to tasks that he could not complete due to his carpal tunnel syndrome. (Dkt. 1 at 4; *see* Dkt. 43-1 at 100). However, Plaintiff has failed to substantiate this assertion with any evidence in admissible form other than his own conclusory testimony. Indeed, what Plaintiff describes as discrimination is, in fact, attempts by Defendant to accommodate his physical condition where that condition undisputedly prevented him from performing all of the essential functions of an asbestos handler. Because Plaintiff has failed to identify any accommodation that would have allowed him to satisfy the essential functions of his position, and the record reveals that

Plaintiff still struggled even after Defendant went beyond its ADA obligations to accommodate him with light-duty tasks, summary judgment is mandated in favor of Defendant dismissing Plaintiff's disability discrimination claim.

Upon the onset of his disability in August 2015, Plaintiff was unable to perform several essential functions of an asbestos handler. Plaintiff testified that lifting up to 40 pounds frequently, lifting over 40 pounds occasionally, "grasping with hands frequently," "repetitive hand motion continuously," and "fine dexterity occasionally" were all essential functions of his job that he could perform when he began work in February 2015. (Dkt. 43-1 at 45-49). Plaintiff's duties as an asbestos handler did not change between February 2015 and the onset of his alleged disability in August 2015. (*Id.* at 66). During that time, he was primarily tasked with removing asbestos by using a power washer, which required the use of both his hands. (Dkt. 42-1 at ¶¶ 29-30, 33, 43; *see* Dkt. 43-1 at 64-65; Dkt. 44 at ¶ 22). Plaintiff had to maintain a firm grasp on the power-washer wand and remain in a stable position to continuously direct the flow of water. (*See* Dkt. 43-1 at 64-65). Plaintiff was unable to perform this task after August 2015 because of his disability. (*See id.* at 84).

Plaintiff's other duties as an asbestos handler also required the use of both hands to scale ladders and scaffolds, change hoses and filters on the water treatment system, and remove chemicals and other compounds from various fixtures at the worksite. (*See* Dkt. 42-1 at ¶¶ 35-36, 38-39; Dkt. 43-1 at 53-56, 57-61). Once Plaintiff was placed on restricted duty because of the pain he experienced in his right arm, he could not perform any of the above-listed essential functions with his right hand, which also happened to be his dominant hand. (Dkt. 43-1 at 97-99).

Furthermore, Plaintiff testified that the only accommodation he ever requested from Defendant was that he be removed from his power-washing assignment. (*Id.* at 106). Defendant complied with this request (*id.*), and then made numerous attempts to provide Plaintiff with tasks not normally attendant to his position as an asbestos handler in order to permit his continued presence on the worksite (*see* Dkt. 42-1 at ¶¶ 63-67; Dkt. 43-1 at 68-69, 71, 84-90; Dkt. 44 at ¶¶ 26-28; Dkt. 45 at ¶ 30). While Plaintiff also testified that he could perform "[a]ll" the duties required of an asbestos handler as of the date of his alleged termination (Dkt. 43-1 at 108-09), this self-serving testimony is given no weight given that it flatly contradicts Plaintiff's testimony that he was unable to use his dominant arm to perform a number of the "essential functions" of an asbestos handler, *see Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (stating that "self-serving" deposition testimony is not alone sufficient to defeat a properly supported summary judgment motion); *Crenshaw v. Hamilton*, 25 F. Supp. 3d 368, 369 (W.D.N.Y. 2014) ("[T]he Second Circuit has recognized . . . occasions when the record is so bereft of evidence, apart from the plaintiff's own self-serving and contradictory testimony, that the court has no choice but to make *some* assessment of whether the plaintiff's allegations are credible enough for a jury to find in his favor." (citing *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005))); *Lee Loi Indus., Inc. v. Impact Brokerage Corp.*, 473 F. Supp. 2d 566, 570 (S.D.N.Y. 2007) ("While the Court may not assess credibility on summary judgment, if the evidence is contradictory or implausible, it may be disregarded.").

The undisputed facts demonstrate that Plaintiff was unable to perform all the essential functions of an asbestos handler without a reasonable accommodation at the time

he was allegedly terminated. *See Jackan v. N.Y. State Dep't of Labor*, No. 97-CV-0483, 1998 WL 760266, at *9 (N.D.N.Y. Oct. 26, 1998) ("It is undisputed that plaintiff cannot climb ladders, work at heights, or perform other essential functions of the job without reasonable accommodation. The plaintiff, therefore, must propose a plausible accommodation. . . ." (footnote omitted)), *aff'd*, 205 F.3d 562 (2d Cir. 2000); *see also Snowden v. Trs. of Columbia Univ.*, 612 F. App'x 7, 9 (2d Cir. 2015) (affirming summary judgment for the defendant where the plaintiff did not dispute that certain tasks "were essential functions of her position" and where "the undisputed facts support the district court's ruling . . . that there were essential functions of [the plaintiff]'s job that she could not perform"). Furthermore, Plaintiff fails to suggest any reasonable accommodation that would allow him to fulfill all essential functions of his job as an asbestos handler—a position that undisputedly requires significant dexterity and continuous actions with both hands. (*See* Dkt. 42-1 at ¶¶ 29-30, 33, 35-36, 43; Dkt. 43-1 at 45-49, 53-56, 57-61, 64-65; Dkt. 44 at ¶¶ 22-23)); *Cousins v. Howell Corp.*, 113 F. Supp. 2d 262, 270-71 (D. Conn. 2000) ("Plaintiff has failed to suggest any accommodation that could have been offered by her employer in March, 1997, that would have made this possible. The ADA does not require employers to retain disabled employees who cannot perform the essential functions of their jobs with or without reasonable accommodation."); *Hardy v. Vill. of Piermont, N.Y.*, 923 F. Supp. 604, 610 (S.D.N.Y. 1996) (granting summary judgment under the Rehabilitation Act where the plaintiff failed to "suggest that any reasonable accommodation would enable [her] to carry out these essential functions"); *see also Sharma v. Potter*, No. 06 CIV. 4448 (GAY), 2008 WL 461377, at *3 (S.D.N.Y. Feb. 14,

2008) ("[D]efendants contend that the essential functions of the . . . position include the ability to lift up to seventy pounds, to carry forty-five pounds, to walk and stand for up to eight hours a day and to pull, bend and reach above the shoulder on a consistent basis. Plaintiff proffers no evidence to the contrary. Thus, plaintiffs [sic] requested accommodation-assigning to him only the "light duties" of an [Sales, Service and Distribution Associate] consistent with his medical limitations-would eliminate the essential functions of the . . . position."). As noted above, the only accommodation Plaintiff ever requested was that he be removed from his power-washing assignment, and the record reveals that Defendant complied with Plaintiff's request. (Dkt. 43-1 at 106).

Although Defendant was not required to create new "light duty" assignments that were not typically required of an asbestos handler, *see Graves*, 457 F.3d at 187, Defendant apparently did so in an effort to keep Plaintiff employed. Eventually, due to seasonal constraints, Plaintiff's continued physical limitations, and his general dissatisfaction with the work assigned, no light duty tasks remained available to Plaintiff. As one district court aptly stated, simply because a defendant "crafted a 'light duty' position that enabled [the plaintiff] to work while excusing him from some undisputed essential functions" of his position, "does not compel [the defendant] to continue to accommodate [the plaintiff] beyond what the law requires." *Uhl v. Home Depot U.S.A., Inc.*, No. 08-CV-3064 JS ETB, 2010 WL 3282611, at *5 (E.D.N.Y. Aug. 13, 2010); *see also Davidson v. LaGrange Fire Dist.*, 523 F. App'x 838, 839 (2d Cir. 2013) ("Davidson also contends that defendants failed to accommodate her by giving her a light duty position. Davidson has failed to demonstrate, however, that there were any light-duty positions available for career firefighters, and our

- 21 -

case law makes clear that defendants were not required to create a new position to accommodate Davidson." (citing *Graves*, 457 F.3d at 187)). The fact that Defendant was unable to maintain Plaintiff's employment through the creation of new light-duty tasks in no way subjects it to liability under the ADA. *See Uhl*, 2010 WL 3282611, at *5 (acknowledging that by providing the plaintiff with new light duty positions, the defendant "exceeded its legal obligations[] by affording [the plaintiff] a more than reasonable accommodation"). As the Second Circuit has explained, "[g]iven that the ADA does not require creating a new position for [the plaintiff] at all, we fail to see how it can dictate the duration of a new position that his employer created for him as a matter of grace." *Graves*, 457 F.3d at 187; *see Palmieri*, 947 F. Supp. 2d at 203 ("[S]imply because [the plaintiff] was given light duty does not alter the essential functions of his job as a patrol officer."); *see also Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001) ("[E]vidence that accommodations were made so that an employee could avoid a particular task merely shows the job could be restructured, not that [the function] was non-essential. To find otherwise would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers." (quotation omitted)).

While the parties dispute whether Plaintiff was able to adequately perform even the light-duty tasks assigned to him, the mere fact that Plaintiff may have been unable to do so because of his disability does not demonstrate that he was able to perform the essential functions of an asbestos handler with or without a reasonable accommodation. If anything, Plaintiff's difficulty completing light-duty assignments provides further support for the conclusion that no reasonable accommodation could be crafted to permit his continued

presence on the workforce as an asbestos handler. Simply because Plaintiff was unable to perform the essential functions of his position *because* of his disability, does not mean that Defendant's attempts to provide him alternative responsibilities constituted discriminatory conduct. *See Murray*, 2001 WL 603698, at *6 (noting "it is irrelevant that the lack of qualification is due entirely to a disability" (citing *Matthews*, 128 F.3d at 1195)). And since Plaintiff has pointed to no evidence suggesting that a reasonable accommodation would have enabled him to perform the essential functions of his job, nor has he even identified any such accommodation for this Court's consideration, whether he was terminated from his position because he no longer could perform the necessary qualifications for his job or resigned on his own accord is immaterial to the success of his disability discrimination cause of action.

In sum, Defendant has demonstrated that Plaintiff was unable to perform the essential functions of his position with or without a reasonable accommodation, and Plaintiff has failed to raise any such triable issues by admissible proof. Accordingly, to the extent Plaintiff alleges a disability discrimination claim under the ADA, that claim is dismissed.

### B. Plaintiff's Hostile Work Environment Claim is Dismissed

Plaintiff also claims that he was harassed on the basis of his disability. (*See* Dkt. 1 at ¶ 13; Dkt. 43-1 at 106-08 (explaining that he is asserting a claim for workplace harassment)). "Harassment is actionable when it creates a hostile work environment which is 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [plaintiff's] employment were thereby altered.'" *Joseph v. N.*

*Shore Univ. Hosp.*, 473 F. App'x 34, 37 (2d Cir. 2012) (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).

Although for years "district courts have found that the ADA encompasses hostile work environment claims," *Monterroso v. Sullivan & Cromwell*, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008), the Second Circuit only recently confirmed that a plaintiff may pursue a hostile work environment claim under the ADA in this Circuit, *see Fox v. Costco Wholesale Corp.*, No. 17-0936-CV, 2019 WL 1050643, at *5 (2d Cir. Mar. 6, 2019) ("We have previously assumed without deciding that hostile work environment claims are cognizable under the ADA. Moreover, a number of courts that have considered this question have found such claims to be cognizable under the ADA. We are persuaded by our sister Circuits, which have reasoned that claims for hostile work environment are actionable under the ADA." (citations omitted)). Those previous district court decisions "which recognize[d] hostile work environment claims under the ADA appl[ied] the same standard utilized in Title VII cases." *Murphy v. BeavEx, Inc.*, 544 F. Supp. 2d 139, 150 (D. Conn. 2008). The Second Circuit has now specifically endorsed this approach. *See Fox*, 2019 WL 1050643, at *6 ("Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—it follows that disabled Americans should be able to assert hostile work environment claims under the ADA, as can those protected by Title VII under that statute, and we here so recognize." (quotation and citation omitted)).

Accordingly, in evaluating whether to grant or deny Defendant's motion for summary judgment, the Court will continue to rely upon the analytic framework already established by pre-*Fox* decisions issued in this Circuit.

> In order to defeat summary judgment on a claim of hostile work environment, "plaintiff must demonstrate (1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."

*Castro v. City of New York*, 24 F. Supp. 3d 250, 271 (E.D.N.Y. 2014) (alterations in original) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). "A plaintiff must show not only that [he] subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010). "Even an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered." *Fox*, 2019 WL 1050643, at *6. Accordingly, "a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Alfano*, 294 F.3d at 374 (quotation omitted). However, "[a]s a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

In examining the vitality of a hostile work environment claim, courts in this Circuit "look to the record as a whole and assess the totality of the circumstances." *Gorzynski*, 596 F.3d at 102. Relevant factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "Finally, the plaintiff must show that he was subjected to the alleged hostility because of his membership in a protected class." *Castro*, 24 F. Supp. 3d at 271 (citing *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)).

As was the case in *Fox*, Defendant does not challenge whether Plaintiff subjectively believed his work environment was abusive, and thus, Defendant's motion turns on whether the workplace was objectively hostile or abusive as a result of actions attributable to Defendant. *See Fox*, 2019 WL 1050643, at *6 ("The record here supports a finding that Fox believed the work environment at the Holbrook Costco to be abusive. The parties do not dispute that; the issue is whether the work environment was objectively abusive, and, if so, whether the abusive conduct can be imputed to Costco."). Plaintiff testified that he was subject to workplace harassment because he was assigned to jobs he could not complete, his supervisors wanted him to quit, and his co-workers would laugh at him during morning meetings. (Dkt. 43-1 at 106-07). Plaintiff has also claimed that he was mocked, assigned unnecessary and/or unsafe jobs, issued unwarranted written warnings, denied overtime wages, temporarily suspended, and subjected to changes to his work and lunch hours. (*See* Dkt. 43-2 at 24-28, 32, 34, 36, 59-60, 62-63). Nonetheless, the type of

"conduct of which [P]laintiff complains is far from 'offensive, pervasive, and continuous enough' to meet the 'demanding' standard for establishing an abusive working environment under the ADA." *Monterroso*, 591 F. Supp. 2d at 585 (quoting *Scott v. Mem'l Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002)).

The mere fact that others might have laughed at Plaintiff is insufficient to establish a hostile workplace environment, especially where Plaintiff testified that Defendant's employees never made "derogatory comments" to him about his disability. (Dkt. 43-1 at 108); *see Fossesigurani v. City of Bridgeport Fire Dep't*, No. 3:11-CV-752 VLB, 2012 WL 4512772, at *8 (D. Conn. Oct. 1, 2012) ("Courts in the Second Circuit have found that '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 76 (2d Cir. 2001), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009))); *Falso v. Sutherland Glob. Servs.*, 592 F. Supp. 2d 373, 378 (W.D.N.Y. 2009) ("[The plaintiff]'s deposition testimony that [his team leader] harassed him by moving [the plaintiff]'s workplace on one occasion and 'repeating himself over and over again,' and his claim that coworkers talked and laughed near his workspace and/or stared at him on isolated occasions, are insufficient to establish a hostile work environment, nor does the record contain any evidence that [the defendant] otherwise subjected [the plaintiff] to ridicule, insult, or any physically threatening or humiliating conduct."), *aff'd*, 375 F. App'x 113 (2d Cir. 2010). Indeed, other than his own self-serving testimony, the record is devoid of evidence supporting Plaintiff's conclusion that he was intentionally placed in job positions that he "couldn't

do"; the tasks he was given were "light-duty" assignments aimed at accommodating his physical disability. (*See* Dkt. 42-1 at ¶¶ 63-65; *see* Dkt. 43-1 at 68-69, 71, 84, 86, 88-90; Dkt. 44 at ¶¶ 26-28; Dkt. 45 at ¶ 30); *see also Castro*, 24 F. Supp. 3d at 271 (finding the plaintiff's allegations of "laughter and name-calling" and the assignment of "physical tasks" such as moving "boxes and empty trash cans" did not create a "hostile work environment" as there was "no basis to conclude" that this conduct was imposed "*because* plaintiff was disabled"); *Vito v. Bausch & Lomb, Inc.*, No. 07-CV-6500 CJS, 2010 WL 681230, at *10 (W.D.N.Y. Feb. 23, 2010) (rejecting the plaintiff's allegations of a hostile work environment where he alleged that just three individuals "laughed when she spoke," there was "no indication that her co-workers mocked her because of her sex or because of her race/nationality, . . . the persons laughing never used slurs or epithets, and there is no indication that such laughter interfered with [p]laintiff's work"), *aff'd*, 403 F. App'x 593 (2d Cir. 2010). In other words, there is no admissible evidence demonstrating that any laughter was directed at Plaintiff because of his disability, outside his subjective beliefs.

Moreover, even if any of the tasks assigned to Plaintiff were unpleasant or remained difficult to complete due to his alleged disability, such allegations do not demonstrate the possible existence of a hostile work environment. *See Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 14-CV-05125 (CBA) (RER), 2016 WL 11318241, at *10 (E.D.N.Y. Mar. 3, 2016) (finding the plaintiff's complaints that "she was assigned a heavy workload; denied proper trainings, resources and assistance to perform her work; and was treated unfairly" insufficient to establish the existence of a hostile work environment), *report and recommendation adopted*, 2018 WL 1603872 (E.D.N.Y. Mar.

30, 2018); *Tse v. New York Univ.*, No. 10 Civ. 7207 (DAB), 2013 WL 5288848, at *14 (S.D.N.Y. Sept. 19, 2013) (while acknowledging that "moving to a temporary space undoubtedly was tedious and difficult" without assistance, the plaintiff's claim that the defendant "ignored [her] disability limitations" did not establish a hostile work environment); *Daniels v. Health Ins. Plan of Greater N.Y.*, No. 02 CIV. 6054 (HB), 2007 WL 27115, at *3, *5-6 (S.D.N.Y. Jan. 4, 2007) (granting the defendants summary judgment where the plaintiff alleged that she developed "carpal tunnel syndrome" during her employment, and that "[d]espite her disabilities" and "a doctor's note that stated she was unable to engage in heavy lifting," she was still required "to file documents" and maintain "a heavy workload"); *see also Macri v. Newburgh Enlarged City Sch. Dist.*, No. 01 CIV.1670(MBM), 2004 WL 1277990, at *8 (S.D.N.Y. June 8, 2004) ("Because [the plaintiff] has not provided any basis for inferring that [the head custodian]'s occasional assignment of unpleasant tasks to her constituted mistreatment, these incidents add no weight to her hostile work environment claim."). Work reassignments and rescheduling "do not rise to the level of an actionable hostile work environment claim," *De la Cruz v. City of New York*, 783 F. Supp. 2d 622, 644 (S.D.N.Y. 2011); *see Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[R]eceiving unfavorable schedules or work assignments . . . do not rise to the level of adverse employment actions . . . because they [do] not have a material impact on the terms and conditions of [p]laintiff's employment." (quotation omitted)), and to the extent Plaintiff suggests that he was required to work in unsafe conditions while logging vehicular ingress and egress from the worksite, this claim too is unsubstantiated by admissible proof, *see Fox v. Amtrak*, No. 04-CV-1144,

2006 WL 395269, at *6 (N.D.N.Y. Feb. 16, 2006) (concluding that the plaintiff could not demonstrate the existence of a hostile work environment where his "contention that the employer placed [him] in a 'life threatening situation' amounts to nothing more than a broad conclusory allegation unsupported by the record"), *aff'd*, 241 F. App'x 771 (2d Cir. 2007).

To the extent Plaintiff may also rely upon the written reprimands he was issued on October 26, 2015 (Dkt. 42-1 at ¶ 86; *see* Dkt. 45 at ¶ 43; Dkt. 45-1 at 18-20), it appears he received these warnings on only one occasion, and they in no way altered the conditions of his employment, *see Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004) (sexual communications occurring within the span of two months and a subsequent disciplinary "write-up" did not create a hostile work environment); *Johnson v. Conn. Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 3:17-CV-00901 (JAM), 2018 WL 306697, at *8 (D. Conn. Jan. 5, 2018) (the plaintiff's allegations that his supervisor "cited plaintiff for an unauthorized absence, gave him a negative evaluation, and denied him mentoring" were insufficient to state a hostile work environment claim); *Davis-Molinia v. Port Auth. of N.Y. & N.J.*, No. 08 CV 7584 GBD, 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (the plaintiff's allegations failed to establish a hostile work environment where he was allegedly denied time off and told he would never be able to take a vacation, was excluded from meetings, had several job responsibilities stripped from him, yelled at in front of his coworkers, and had disciplinary charges filed against him), *aff'd*, 488 F. App'x 530 (2d Cir. 2012); *St. Louis v. N.Y.C. Health & Hosp. Corp.*, 682 F. Supp. 2d 216, 234 (E.D.N.Y. 2010) ("Plaintiff's receipt of negative job evaluations and disciplinary

warnings resulting from the failure to meet a work requirement, without more, do not support a claim of sex-based hostile work environment."). And, again, there is no admissible evidence connecting these reprimands to Plaintiff's disability as they were indisputably based upon his failure to comply with Defendant's policy for employee absences. (Dkt. 42-1 at ¶¶ 81-84, 86; *see* Dkt. 45 at ¶¶ 41-43); *see generally Castro*, 24 F. Supp. 3d at 271 ("[T]he plaintiff must show that he was subjected to the alleged hostility *because of his membership* in a protected class." (emphasis added)).

Similarly, Plaintiff's one-week suspension from work, while tangentially related to Plaintiff's disability, was indisputably a result of the fact that Plaintiff had produced conflicting doctor's notes dictating his limitations. (Dkt. 42-1 at ¶¶ 93-94, 97; *see* Dkt. 45 at ¶¶ 48-49; Dkt. 45-1 at 26). Once Plaintiff conveyed that he was still restricted in his right arm to clarify the medical documentation, he was permitted to return to work. (Dkt. 42-1 at ¶¶ 98-100; *see* Dkt. 45 at ¶¶ 50-51; Dkt. 45-1 at 28); *see Guy v. MTA N.Y.C. Transit*, No. 15-CV-2017 (LDH)(LB), 2016 WL 8711080, at *8 (E.D.N.Y. Sept. 23, 2016) (finding allegations that the plaintiff's supervisor laughed at him, and that the plaintiff was demoted, suspended, and denied promotions as insufficiently pervasive to maintain a hostile work environment claim); *Gibson v. Wyeth Pharm., Inc.*, No. 07 CIV. 946 LTS GAY, 2011 WL 830671, at *11 (S.D.N.Y. Mar. 9, 2011) (finding one "explicitly racial comment," forced overtime, a "three-day suspension" and a written warning insufficient to maintain a hostile work environment claim); *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 78 (D.D.C. 2005) (the plaintiff's allegations that "she was 'subject to unwelcome harassment when she was suspended for five days; denied sick leave; ordered to provide

medical documentation; ordered to undergo an [independent medical examination]; ordered to provide a birth certificate; ordered to return the office keys prior to her suspension; and terminat[ed]'" were not sufficiently severe or pervasive to maintain a hostile work environment claim), *aff'd*, 187 F. App'x 1 (D.C. Cir. 2006); *see also Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (affirming dismissal of hostile work environment claim where the plaintiff was allegedly "ostracized" by his supervisors over a three-year period and was suspended without pay for ten business days).

Likewise, Plaintiff appears to have complained of being deprived of overtime opportunities on only one occasion (Dkt. 43-2 at 63), and the bare assertion that he was no longer assigned overtime beginning in November (*id.* at 57) does not arise to the level of severity necessary to maintain a hostile work environment claim considering the undisputed evidence that too few positions were available for Plaintiff to even fill regular working hours (Dkt. 44 at ¶ 37; Dkt. 45 at ¶ 38); *see Mooney v. City of New York*, No. 18CV328(DLC), 2018 WL 4356733, at *6 (S.D.N.Y. Sept. 12, 2018) ("The [amended complaint] does not allege that [New York City Department of Sanitation] was so 'permeated' with sexism as to alter the terms and conditions of Mooney's employment. Generally speaking, the [amended complaint] alleges that Mooney had a disappointing and tense working relationship with her supervisor and over the course of approximately four years, faced petty slights at work, and the loss of two weeks of vacation and the opportunity to accrue one day of overtime pay." (citation omitted)); *Isbell v. City of New York*, 316 F. Supp. 3d 571, 592 (S.D.N.Y. 2018) (the plaintiffs' allegations did not state a hostile work environment claim where they were allegedly refused overtime and training opportunities

and subject to criticism, discipline, and "harsh and sarcastic tone[s]" among other things); *Villar v. City of New York*, 135 F. Supp. 3d 105, 133 (S.D.N.Y. 2015) (denying hostile work environment claim where the plaintiff "claims that, at least between 2004 and 2006, she was offered fewer overtime opportunities than other lieutenants").

In sum, Defendant has demonstrated that no triable issues of fact exist as to whether Plaintiff suffered actionable harassment or otherwise toiled under a hostile work environment, and Plaintiff has failed to raise any such triable issues by admissible proof. Accordingly, to the extent Plaintiff's Complaint alleges a hostile work environment cause of action, Defendant is granted summary judgment on that claim and it is dismissed.

### C.     Plaintiff's Retaliation Claim is Dismissed

Courts in the Second Circuit "analyze a retaliation claim under the ADA using the same framework employed in Title VII cases." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001). As such, "ADA retaliation claims are subject to the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). . . ." *EEOC v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 199 (D. Conn. 2017). "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). If the defendant can carry this burden, "the plaintiff must [then] point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra*, 252 F.3d at 216; *see Gorzynski*, 596 F.3d at 106 ("Once such a reason

is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination."). "The plaintiff 'has the ultimate burden of showing that the proffered reasons are a pretext for retaliation [under the ADA].'" *Williams v. N.Y.C. Dep't of Health & Mental Hygiene*, 299 F. Supp. 3d 418, 427 (S.D.N.Y. 2018) (quoting *McDonald v. City of New York*, 786 F. Supp. 2d 588, 613 (E.D.N.Y. 2011)).

### 1. The Court Assumes, Without Deciding, That Plaintiff Has Established a *Prima Facie* Case of Retaliation

A *prima facie* case of retaliation requires a plaintiff to demonstrate that: "(1) [he] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "The Supreme Court has held that in the context of a Title VII retaliation claim, an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

Plaintiff testified that his retaliation claim is based upon the fact that he "reported them"—presumably, Defendant's employees—and then was fired as a result. (Dkt. 43-1 at 101-02). However, the Court will consider the totality of the alleged conduct addressed above regarding Plaintiff's disability discrimination and hostile work environment claims in determining whether a retaliation claim may be maintained in this action. "For the

purposes of this motion, [the Court] will assume without deciding that [P]laintiff has adequately established a *prima facie* case of retaliation." *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 265 (E.D.N.Y. 2009), *aff'd*, 371 F. App'x 115 (2d Cir. 2010); *see Pena-Barrero v. City of New York*, No. 14-CV-9550 (VEC), 2017 WL 1194477, at \*19 (S.D.N.Y. Mar. 30, 2017) ("Assuming, without deciding, that Plaintiff has established a prima facie case of retaliation, Defendants have provided legitimate, non-discriminatory reasons for Plaintiff's termination. . . ."), *aff'd*, 726 F. App'x 31 (2d Cir. 2018); *Floyd v. N.Y.C. Dep't of Educ.*, No. 10 CIV. 8951, 2014 WL 171156, at \*12 (S.D.N.Y. Jan. 13, 2014) (same).[4]

---

[4]     To the extent that Plaintiff relies upon the written warnings issued to him on October 26, 2015 (Dkt. 42-1 at ¶ 86; *see* Dkt. 45 at ¶ 43; Dkt. 45-1 at 18-20), or his one-week suspension from work starting November 2, 2015, and ending November 9, 2015, (Dkt. 42-1 at ¶¶ 93-94, 97-100; *see* Dkt. 45 at ¶¶ 48-51; Dkt. 45-1 at 26, 28), both acts took place before Defendant became aware that Plaintiff had filed his NYSDHR complaint and his EEOC charge, and thus, there can be no causal connection between these actions and the protected activity involved in this case, *see Moy v. Perez*, 712 F. App'x 38, 40 (2d Cir. 2017) ("Like the district court, we conclude that, to the extent Moy characterizes the adverse promotion decision as a retaliatory adverse employment action, his claim fails because he does not allege *prior participation* in a protected activity." (emphasis added)); *Sinopoli v. Regula*, 125 F.3d 844, 1997 WL 624987 (Table), at \*3 (2d Cir. 1997) ("Sinopoli first complained about the overtime reduction in January 1994, four months *before* he filed his first discrimination complaint in April 1994. Thus, the reduction in overtime pay could not have been in retaliation for filing the complaint." (emphasis added)); *see also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014) ("Title VII does not require that a causal connection exist between a protected activity and an adverse employment action that occurred *before* that activity."). In other words, Plaintiff *cannot* demonstrate a *prima facie* case of retaliation arising from these actions, and any such claim is dismissed on that ground. The relevant adverse actions for purposes of analyzing any retaliation claim must have occurred after Defendant became aware of Plaintiff's protected activity.

## 2. Defendant has Provided Legitimate, Non-Retaliatory Reasons for Plaintiff's Alleged Adverse Actions, and Plaintiff Has Failed to Establish that These Reasons Were Pretextual

Defendant has submitted evidence that it never intended to discharge Plaintiff from his position; rather, Defendant only wished to offer Plaintiff extended medical leave to permit Plaintiff time to recover before returning to work. (Dkt. 44 at ¶ 44; Dkt. 45 at ¶ 54; Dkt. 50-1 at 2-8). According to Defendant, it had no more light duty tasks to offer Plaintiff due to the seasonal restrictions of the work assignments and Plaintiff's own physical limitations. (*See* Dkt. 44 at ¶¶ 44-45; Dkt. 45 at ¶¶ 38, 54; Dkt. 50-1 at 3). Defendant anticipated that Plaintiff would resume his responsibilities as an asbestos handler after he returned to work from his medical leave of absence. (Dkt. 44 at ¶ 49; Dkt. 50-1 at 3, 7).

Several courts both within and without this Circuit have determined that the unavailability of appropriate work assignments for a plaintiff employee is a legitimate, non-retaliatory reason for a change in work conditions. *See Smith v. New Venture Gear, Inc.*, 320 F. App'x 33, 38 (2d Cir. 2009) (affirming summary judgment for the defendants where the plaintiff failed to rebut the "explanation that her change in employment might have been due to the elimination of light duty positions at that time"); *Puletasi v. Wills*, 290 F. App'x 14, 18-19 (9th Cir. 2008) ("Assuming that Puletasi established a *prima facie* case, [U.S. Immigration and Customs Enforcement ("ICE")] offered a legitimate reason for the adverse actions at issue: Puletasi could not perform the essential functions of his position. In response, Puletasi offers no evidence that ICE's legitimate non-retaliatory reason was pretextual. He merely points to evidence showing that he was able to perform the duties of his temporary light duty position. This does not present a triable issue of fact

because it does not directly refute the legitimate reason offered by ICE."); *Saunders v. Ford Motor Co.*, No. 3:14-CV-00594-JHM, 2017 WL 489419, at *2 (W.D. Ky. Feb. 6, 2017) (rejecting the plaintiff's retaliation claim where the "record clearly establishes that [the plaintiff] was removed from his job due to the paint fumes in that job bothering him, . . . and with no other work available, [he] was placed on [No Work Available] status"); *Federico v. Donahoe*, No. CV-11-1952-PHX-GMS, 2013 WL 3991818, at *9 (D. Ariz. Aug. 5, 2013) ("[The defendant] claims that supervisors sent [the plaintiff] home because there was no work currently available for [her] that fit her medical restrictions. At this stage, the Court looks at the employer's evidence as true. The unavailability of work perform [sic] qualifies as a legitimate, nonretaliatory reason for the adverse employment action of sending [the plaintiff] home." (citation omitted)); *White v. Malphus Constr. Co.*, No. C.A. 9:07-3052-PMD, 2008 WL 4221723, at *3 (D.S.C. Sept. 15, 2008) ("Plaintiff here has shown nothing other than proximity in time to support his claim of retaliatory discharge. Defendant's legitimate, non-retaliatory reason for terminating [p]laintiff was that it simply did not have any permanent light duty jobs and [p]laintiff has no evidence to dispute that fact."); *see also Hylton v. Norrell Health Care of N.Y.*, 53 F. Supp. 2d 613, 620 (S.D.N.Y. 1999) ("[The defendant] has offered legitimate, business-related reasons for its actions. [The defendant] gave 'regular' work to [the plaintiff] after her sexual harassment complaint, when that work was available in the face of a business downturn. That 'regular' work only ceased when [the plaintiff] rejected work from [the defendant].").

Defendant has also supplied evidence that while Plaintiff eventually was no longer assigned any overtime, this was due to the fact that Defendant was already struggling to

find *any* work to provide Plaintiff. Beckingham explained that they "no longer needed him to perform overtime work since [they] were struggling to find sufficient work for him to perform during regular workings hours." (Dkt. 44 at ¶ 37). Cox similarly averred that "as the projects moved forward and the winter weather set in, . . . [they] were [often] unsure what tasks to assign to [Plaintiff] until after the workday began and an assessment of the tasks could be made." (Dkt. 45 at ¶ 38).

The fact that Plaintiff was unable to perform the essential functions of his position and could no longer perform the types of assignments that generally permitted overtime pay is a legitimate, non-retaliatory reason explaining why Plaintiff was no longer given overtime. *See Basith v. Cook County*, 241 F.3d 919, 933 (7th Cir. 2001) ("Cook County ha[s] provided legitimate non-retaliatory reasons for requiring Basith to take medical leave and for refusing to schedule him for overtime and holiday work. In particular, Basith could not perform the essential functions of his job, and there was no need to perform overtime or holiday work under his special assignment."); *see also E.E.O.C. v. Aldi, Inc.*, No. CIV.A. 06-01210, 2008 WL 859249, at *17 (W.D. Pa. Mar. 28, 2008) (the inability to perform the essential functions of a position is a legitimate nonretaliatory reason explaining the plaintiff's dismissal).

Furthermore, Plaintiff's work schedule and assignments were altered in an effort to provide him with light duty assignments to accommodate his disability. *See Wulff v. Sentara Healthcare, Inc.*, 513 F. App'x 267, 272 (4th Cir. 2013) ("The district court assumed that Wulff established her *prima facie* case of retaliation but granted summary judgment because Sentara explained that it removed Wulff from the schedule because she

was unable to perform the essential functions of her job, and Wulff produced no evidence that this explanation was pretextual. We find the district court's analysis and conclusion to be correct."); *see, e.g.*, *Puletasi*, 290 F. App'x at 18-19; *Basith*, 241 F.3d at 933; *Federico*, 2013 WL 3991818, at *9. Similarly, Plaintiff was assigned to perform fire watch duties while his co-workers ate lunch because that was one of the tasks he could perform with his physical limitations, and it was required to ensure that the gas-powered tools did not reignite. (*See* Dkt. 44 at ¶ 39; Dkt. 45 at ¶ 40).

The undisputed evidence demonstrates that Defendant provided Plaintiff with a number of light-duty tasks to perform after relieving him from power-washing duty to accommodate for his disability. (*See* Dkt. 43-1 at 71, 84, 86, 88-90; Dkt. 44 at ¶¶ 26-28; Dkt. 45 ¶¶ 25, 30). Plaintiff testified that many of these tasks still required some use of his right arm, and thus, resulted in at least some discomfort or an inability to safely complete them. (*See, e.g.*, Dkt. 43-1 at 69-71, 91-92). Defendant supplied unrebutted evidence that by late December, it had run out of additional light-duty tasks to offer Plaintiff that would account for his physical limitations and be satisfactory to him. (*See* Dkt. 44 at ¶¶ 44-45; Dkt. 45 at ¶¶ 38, 54; Dkt. 50-1 at 3). As a result of the limited number of tasks available to Plaintiff due to his disability, seasonal constraints, and the completion of the projects at the worksite, Defendants were unable to find tasks sufficient to fill Plaintiff's regular working hours and thus, Plaintiff was unable to seek overtime and was asked to work different hours from his co-workers. (*See* Dkt. 44 at ¶¶ 37, 39; Dkt. 45 at ¶¶ 38, 40). Plaintiff offers no evidence to suggest that these reasons were pretextual for retaliation due to his alleged disability. Indeed, Plaintiff's self-serving and conclusory testimony simply

that he was fired as a result of his disability (*see, e.g.*, Dkt. 43-1 at 101-02, 105, 108), and

his generic and nondescript assertions that he was no longer assigned overtime and had his

work assignments and work schedule altered, are insufficient to demonstrate that

Defendant's reasons were pretextual and avoid summary judgment, *see Trane v. Northrop*

*Grumman Corp.*, 94 F. Supp. 3d 367, 375 (E.D.N.Y. 2015) ("Conclusory allegations of

discrimination are insufficient to show that a defendant's non-discriminatory reasons are

pretexts and avoid summary judgment."), *aff'd*, 639 F. App'x 50 (2d Cir. 2016).

Therefore, Defendant has submitted legitimate, non-retaliatory reasons for

Plaintiff's alleged adverse actions, and Plaintiff has failed to point to any evidence

demonstrating that these reasons were pretextual. Accordingly, to the extent Plaintiff's

Complaint alleges an ADA retaliation cause of action, Defendant is granted summary

judgment on that claim as well and it too is dismissed.

## III.     The Claims Arising from Plaintiff's NYSDHR Complaints

Plaintiff's Complaint does not make any reference to the NYSHRL and appears to

only allege claims for disability discrimination, harassment, and retaliation arising under

the ADA. (*See* Dkt. 1 at 1, 4). However, Plaintiff does attach to his Complaint a

"Determination After Investigation" issued by the NYSDHR, indicating that Plaintiff filed

a verified complaint with the NYSDHR on December 24, 2015, which alleged violations

of the NYSHRL. (*Id.* at 8-13). Plaintiff also attaches a "Final Investigation Report and

Basis of Determination" to his Complaint, indicating that the NYSDHR found "probable

cause to support the allegations of the [NYSHRL] complaint." (*Id.* at 14-16).[5] Given

Plaintiff's *pro se* status, the Court will assume that Plaintiff intended to assert NYSHRL

claims alongside his ADA causes of action, at least as they pertain to the allegations within

the December 24, 2015, NYSDHR complaint referenced by Plaintiff's attachments.

Because the record demonstrates that Plaintiff also filed earlier NYSDHR complaints

referenced by Defendant in its motion papers, the Court will also determine the vitality of

any claims asserted in those complaints for the sake of completeness.

A. **This Court Lacks Jurisdiction over Plaintiff's NYSHRL Allegations Asserted in His First and Second NYSDHR Complaints**

Defendant argues that "[t]o the extent Plaintiff purports to assert claims under the

[NYSHRL], . . . any such claims are procedurally improper since all NYSHRL claims are

barred by the election of remedies doctrine." (Dkt. 48 at 11). New York Executive Law

---

[5]     The Court notes that the NYSDHR probable cause determination addresses only "the question of probable cause, i.e. that there is sufficient evidence of . . . discrimination and retaliation . . . to warrant a public hearing." *Dollman v. Mast Indus., Inc.*, No. 08 CIV. 10184 WHP, 2011 WL 3911035, at *1 (S.D.N.Y. Sept. 6, 2011) (quotation omitted). Although the Second Circuit has held that "a finding of probable cause by an administrative agency, such as the EEOC, . . . is admissible to help establish [a plaintiff's] prima facie case" in the context of a Title VII claim, it is "not determinative." *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985), *aff'd and remanded*, 479 U.S. 60 (1986). Accordingly, simply because the NYSDHR determined that Plaintiff's NYSHRL allegations warranted an administrative hearing does not preclude this Court from dismissing Plaintiff's claims based on a properly supported motion for summary judgment. *See Robles v. Cox & Co.*, 987 F. Supp. 2d 199, 209 (E.D.N.Y. 2013) (rejecting the plaintiff's reliance upon the NYSDHR report because the framework used for determining the presence of probable cause in that context "is a far more lenient standard than the [p]laintiff's burden here" in opposing the defendant's summary judgment motion (quotation omitted)).

§ 297(9) contains an election of remedies provision which provides, in pertinent part, as follows:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction . . . *unless such person had filed a complaint hereunder or with any local commission on human rights* . . . provided that, where the division has dismissed such complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled, such person shall maintain all rights to bring suit as if no complaint had been filed with the division.

(emphasis added). Accordingly, NYSHRL "claims, once brought before the NYSDHR, may not be brought again as a plenary action in another court." *York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 127 (2d Cir. 2002). "Furthermore, there is no question that the election-of-remedies provision[] . . . appl[ies] to federal courts as well as state." *Id.* Thus, "N.Y. Exec. Law § 297(9) deprives courts of subject matter jurisdiction" over claims already decided by the NYSDHR. *Wilson-Richardson v. Reg'l Transit Serv., Inc.*, 948 F. Supp. 2d 300, 304 (W.D.N.Y. 2013) (dismissing the plaintiff's NYSHRL claims previously filed with and fully investigated and decided by the NYSDHR (citing *Skalafuris v. City of New York*, 444 F. App'x 466, 467 (2d Cir. 2011))); *see Moodie v. Fed. Reserve Bank of N.Y.*, 58 F.3d 879, 884 (2d Cir. 1995) ("Both the language of the statute and its consistent judicial interpretation establish that § 297(9) poses an insuperable jurisdictional bar."); *Goldson v. Kral, Clerkin, Redmond, Ryan, Perry & Van Etten, LLP*, No. 13CV2747-GBD-FM, 2014 WL 4061157, at *7 (S.D.N.Y. July 11, 2014) (stating that the election of remedies issue "is jurisdictional," and thus, "the Court must consider the argument"), *report and recommendation adopted*, No. 13 CIV. 2747-GBD-FM, 2014 WL 3974584

(S.D.N.Y. Aug. 13, 2014). Additionally, "[a] claimant cannot avoid the jurisdictional bar presented by § 297(9) by merely adding additional elements . . . [or] by changing his theory." *Wilson-Richardson*, 948 F. Supp. 2d at 304 (alteration in original) (quoting *Carroll v. United Parcel Serv.*, No. 00-7037, 2000 WL 1185583, at *3 (2d Cir. Aug. 21, 2000)); *see McCalla v. City of New York*, No. 15 Civ. 8002 (LAK) (AJP), 2017 WL 3601182, at *37 (S.D.N.Y. Aug. 14, 2017) (stating that the election of remedies doctrine "is not limited to the precise claims brought in the administrative proceeding, but extends to all claims arising out of the same events" (quoting *Coppedge v. N.Y.C. Sales Inc.*, 10 Civ. 6349, 2011 WL 4343268 at *2 (S.D.N.Y. Sept. 8, 2011))), *report and recommendation adopted*, No. 15-CV-8002 (LAK), 2017 WL 4277182 (S.D.N.Y. Sept. 22, 2017).

Here, it is undisputed that Plaintiff filed three separate complaints with the NYSDHR. (*See* Dkt. 42-1 at ¶¶ 147, 150, 153). In regards to the first two administrative complaints, the NYSDHR found "no probable cause" to conclude that the alleged wrongful conduct had occurred, and it dismissed both complaints. (*See* Dkt. 42-1 at ¶¶ 157-58; *see* Dkt. 43-2 at 82-86). The NYSDHR issued its "no probable cause" determinations on April 11, 2016, about five months prior to the commencement of this action. Since none of the exceptions to § 297(9)'s jurisdictional bar are applicable, Plaintiff, having already elected his remedies by seeking recourse through the state administrative agency, may not now assert NYSHRL claims in this action based upon the facts asserted in his first two NYSDHR complaints. *See generally Waller v. Muchnick, Golieb & Golieb, P.C.*, 523 F. App'x 55, 56 n.1 (2d Cir. 2013) ("Under New York law, a litigant who files a claim with the NYSDHR cannot bring the same claim in federal court; the District Court, therefore,

properly concluded that it lacked jurisdiction over plaintiff's claims arising out of New York state and city law." (citing *Desardouin v. City of Rochester*, 708 F.3d 102, 106 (2d Cir. 2013) ("The District Court properly ruled that [the plaintiff's] NYSHRL claim was barred on the basis of election of remedies, in view of N.Y. Exec. Law § 297(9), which . . . precludes resort to courts after claims have been filed with a local commission on human rights."))). Accordingly, to the extent Plaintiff's Complaint seeks to assert NYSHRL claims based upon his first two NYSDHR complaints, Plaintiff's claims are barred by § 297(9)'s election of remedies provision and are dismissed.

**B.     The Court has Jurisdiction to Adjudicate Plaintiff's NYSHRL Allegations Arising from his Third NYSDHR Complaint**

Defendant also seeks dismissal of any NYSHRL claims arising from Plaintiff's third NYSDHR complaint. (*See* Dkt. 48 at 11). Defendant contends that because Plaintiff's third NYSDHR complaint was still pending at the time he filed his federal Complaint, the fact that Plaintiff eventually "obtained a dismissal for administrative convenience with respect to his NYSHRL claims stemming from" his third NYSDHR complaint is immaterial. (*Id.* at 11-12). However, under New York Executive Law § 297(9), where the NYSDHR has dismissed a "complaint on the grounds of administrative convenience, on the grounds of untimeliness, or on the grounds that the election of remedies is annulled, such person *shall maintain all rights to bring suit as if no complaint had been filed with the division*." (emphasis added).

It is undisputed that Plaintiff filed a request with the NYSDHR to dismiss his third complaint in order to pursue his claims in federal court, and that the NYSDHR dismissed

his third administrative complaint based upon this request. (Dkt. 42-1 at ¶ 161). New York State courts and federal courts in this Circuit, including the Second Circuit, have endorsed this procedure. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 76 (2d Cir. 2000) (finding that the district court erred in granting summary judgment where "the plaintiffs requested and received dismissals of their Division of Human Rights complaints based on administrative convenience[,] . . . and obtained them prior to the District Court's decision"); *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 257-58 (2d Cir. 1991) ("Even at the request of the plaintiff, the administrative dismissals do not circumvent the operation of the election of remedies provision. . . . We see no need to read in a restriction upon a plaintiff's ability to have such suits dismissed in order to bring state claims in an ongoing federal proceeding where no such restriction exists in the statute, and which New York courts themselves do not appear to contemplate."); *People of State of N.Y., by Abrams v. Holiday Inns, Inc.*, No. 83-CV-564S, 1992 WL 532169, at *15 (W.D.N.Y. Aug. 28, 1992) ("[A]n effective administrative convenience dismissal may be issued to a plaintiff who has already commenced an action in federal court." (citing *Eastman Chem. Prod., Inc. v. N.Y. State Div. of Human Rights*, 162 A.D.2d 157, 158-59 (1st Dep't 1990))), *adhered to on reconsideration sub nom. People of State of N.Y. by Abrams v. Holiday Inns, Inc.*, No. 83-CV-564S, 1993 WL 30933 (W.D.N.Y. Jan. 28, 1993); *MJ Cahn Co. v. N.Y. State Div. of Human Rights*, 148 A.D.3d 602, 603 (1st Dep't) ("[NYS]DHR properly dismissed Kamate's complaint on the ground that her election of remedies was annulled, notwithstanding that she sought dismissal of the [NYS]DHR complaint only after commencing a state court action alleging the same claims." (citation

- 45 -

omitted)), *leave to appeal denied*, 29 N.Y.3d 919 (2017); *Universal Packaging Corp. v. N.Y. State Div. of Human Rights*, 270 A.D.2d 586, 588 (3d Dep't 2000) ("As State administrative dismissals are permitted to avoid duplicative proceedings and conserve scarce State resources where, as here, the complainant clearly expressed a preference to have the State claim litigated in an already filed Federal action, we cannot find that the determination rendered should be set aside as 'purely arbitrary.'"). Indeed, as one state court aptly explained, "such dismissal clearly effectuate[s]" a plaintiff's election of remedies. *Universal Packaging Corp.*, 270 A.D.2d at 588.

Accordingly, because Plaintiff effectively sought and received the dismissal of his third NYSDHR complaint on the grounds of administrative convenience before the merits of Plaintiff's federal litigation were assessed, it would be erroneous to conclude that Plaintiff is unable to pursue any NYSHRL claims arising from that NYSDHR complaint due to the election of remedies doctrine. In other words, simply because the third NYSDHR complaint was still pending at the time the instant action was commenced does not strip this Court of its jurisdiction to adjudicate any NYSHRL claims arising from that administrative complaint. Therefore, the Court rejects Defendant's position that any and all NYSHRL claims arising from the third administrative complaint are barred from consideration in this action as a result of the election of remedies doctrine.

### C. Remaining NYSHRL Claims

However, to the extent Plaintiff has raised NYSHRL claims in his Complaint, and those claims survived Defendant's procedural challenges discussed above, any such NYSHRL claims are dismissed for the same reasons that Plaintiff's ADA causes of action

do not survive Defendant's motion for summary judgment. *See Stolpner v. N.Y. Univ. Lutheran Med. Ctr.*, No. 16-CV-997(KAM), 2018 WL 4697279, at *32 (E.D.N.Y. Sept. 29, 2018) ("As plaintiff's claims under NYSHRL are analyzed using the same substantive standards as those brought pursuant to the ADA, the analysis is coextensive. Accordingly[,] the court grants defendant's Motion for Summary Judgment as to plaintiff's NYSHRL claims for the same reasons as stated above that the court granted defendant's summary judgment motion on plaintiff's ADA claims."); *Baron v. Advanced Asset & Prop. Mgmt. Sols., LLC*, 15 F. Supp. 3d 274, 281 (E.D.N.Y. 2014) ("[S]ummary judgment motions under the NYSHRL are analyzed under the same *McDonnell Douglas* burden-shifting framework as ADA claims."); *McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 405 n.6 (E.D.N.Y. 2010) ("For the purposes of this summary judgment motion, analysis of plaintiff's claims under the ADA and NYSHRL yields the same results.").

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 42) is granted, and Plaintiff's Complaint (Dkt. 1) is dismissed. The Clerk of Court is directed to close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:     March 28, 2019
           Rochester, New York